**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES OF AMERICA** **[UNDER SEAL],** | **CIVIL ACTION** |
| **PLAINTIFF,** | **----------------------------** |
| **v.** | **FILED UNDER SEAL** **PURSUANT TO** **31 U.S.C. § 3730(b)(2)** |
| **[UNDER SEAL],** | |
| **DEFENDANTS.** | **COMPLAINT** |

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA [UNDER SEAL], | CIVIL ACTION |
| EX REL. | ---------------------------- |
| ZACHARY WELIN, | FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) |
|       PLAINTIFF-RELATOR, v. | FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729, ET SEQ. |
| INTERNATIONAL VITAMIN CORPORATION, CONTINENTAL AGENCY, INC., and MAC CUSTOMS BROKERAGE, INC. [UNDER SEAL], | |
|       DEFENDANTS. | |

2

**COMPLAINT**

Plaintiff and *qui tam* Relator Zachary Welin, through his attorneys Sanford Heisler Sharp, LLP, for his Complaint against Defendants International Vitamin Corporation, Continental Agency, Inc., and MAC Customs Brokerage, Inc. (hereinafter "Defendants") alleges as follows:

## I. <u>INTRODUCTION</u>

1.      This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent statements, records, and claims made and caused to be made by the Defendants and/or their agents and employees in violation of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq*., (hereinafter "the FCA").

2.      Federal law sets forth that customs duties must be paid on merchandise imported to the United States. To facilitate payments, importers must declare all merchandise entered into the United States to United States Customs and Border Protection ("CBP"). They must also report the merchandise's classification for customs purposes, the corresponding duty rate (or duty free status), and the amount of duty owed, if any. Payment must then be remitted to the government. The applicable merchandise classifications and corresponding duty rates are specified in the in the Harmonized Tariff Schedule ("HTS").

3.      Defendants International Vitamin Corporation ("IVC"), Continental Agency, Inc. ("Unipac Continental"), and MAC Customs Brokerage, Inc. ("MAC Customs") have intentionally thwarted this regime. In doing so, they have defrauded the United States of millions of dollars of customs duties owed on nutritional supplements and vitamins.

4.      Defendants perpetrated this fraud by importing vitamins and other dietary supplements under improper HTS codes. In some cases, they claimed a duty rate lower than that

to which the imported merchandise should have been subject. In other cases, Defendants fraudulently claimed duty free treatment.

5.    In one egregious example, IVC, Unipac Continental, and MAC Customs consistently and intentionally avoided paying import duties on Glucosamine Chondroitin. Defendants claimed that Glucosamine Chondroitin, a nutritional **supplement** used mainly by people who have osteoarthritis, was, in fact, a **medicament** with "therapeutic" or "prophylactic" properties. They made this claim even though much peer-reviewed research confirms that Glucosamine Chondroitin does not cure or prevent osteoarthritis, and even though one CBP ruling confirms that it does not qualify for duty free treatment as a **medicament** and another CBP ruling states that it should instead be classified as a **supplement**. But by classifying Glucosamine Chondroitin as a **medicament** instead of as a **supplement**, IVC avoided paying 6.4% import duty on Glucosamine Chondroitin imported from China. Defendants' intentional and repeated misclassification of Glucosamine Chondroitin has alone defrauded the United States Government of approximately $10 million since 2013. Across all of IVC's misclassifications, IVC defrauded the United States Government of more than $13 million as of December 2018.[1]

6.    Once Defendants' fraudulent classification practices became known at IVC, IVC senior managers, led by President and CEO Steven Dai, began a concerted effort to cover up the fraud. They ordered employees to delete all traces of a PricewaterhouseCoopers ("PwC") report that outlined the $13 million of fraud. They further affirmatively created documents designed to feign compliance with customs regulations. At no point did IVC intend to return its fraudulent gains.

---

[1] IVC has continued its fraudulent misclassification practices in 2019. A full damages estimate will need to account for the ongoing nature of IVC's fraud.

7.      All told, IVC, Unipac Continental, and MAC Customs fraudulently withheld millions of dollars in customs duties and penalties from the United States Government. And, to date, these Defendants are affirmatively concealing their avoidance of the obligation to pay these custom duties and penalties.

## II. JURISDICITON AND VENUE

8.      This Court has subject matter jurisdiction over the claims brought under the False Claims Act pursuant to 31 U.S.C. § 3730(a), and 28 U.S.C. § 1331.

9.      Venue and personal jurisdiction lie in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b)–(c). First, defendants IVC and Unipac Continental have imported goods with fraudulent HTS codes through the Port of New York. *See, e.g.*, Ex. 11 (Invoice – 3554814 (GC Jun 18)). Second, all Defendants placed the products on which they avoided obligations to pay customs duties into the stream of commerce. Defendants did this knowing that the products would be sold in the State of New York, including in this District. Defendants also knew that injuries from the avoidance of customs duties would be felt in New York. These injuries include, but are not limited to, the sale of merchandise in New York at prices lower than those of competitor merchandise on which importers properly reported applicable customs duties as well as competitor merchandise made in the United States.

## III. PARTIES

10.      Relator Zachary Welin ("Relator") is a citizen of Dana Point, California and served as a Senior Financial Analyst at IVC from February 18, 2019 until August 16, 2019. In that position, Relator was responsible for enhancing the standard costing system and training the cost accounting department on best practices. In June 2019, Relator began analyzing the effect that

newly announced tariffs would have on IVC's product costs. In so doing, he discovered Defendants' fraud described herein.

11.    Defendant IVC is a private corporation incorporated in Delaware and headquartered in New Jersey. IVC engages in the manufacture, packaging, sale, and distribution of vitamins and nutritional supplements worldwide. IVC imports raw materials—vitamins and nutritional supplements—from China to the United States and sells the supplements to retail corporations such as Walmart, Sam's Club, GNC, Walgreens, and Costco under the customer's brand name (e.g. IVC's Glucosamine Chondroitin is sold in Walgreens under the "Finest" brand name). The vitamins and nutritional supplements are then sold by IVC's customers nationwide, including in New York, through the foregoing retailers. Upon information and belief, IVC earns in excess of $500 million in revenue per year.

12.    Defendant Unipac Continental is a private corporation headquartered in California and incorporated in Delaware. Unipac Continental provides logistics management services, including integrated transportation, freight forwarding, customs brokerage, warehousing, and distribution services. Unipac Continental contracts with IVC to classify IVC's merchandise when IVC imports raw materials, vitamins, and nutritional supplements from China. In particular, Unipac Continental employees certify to the United States Government on CBP Form 7501 that they have truthfully and correctly classified IVC's imported merchandise. But Unipac Continental, on behalf of IVC, intentionally misclassified and continues to misclassify such merchandise causing IVC to pay lower duty rates for imported merchandise. Upon information and belief, Unipac Continental earns in excess of $30 million in revenue per year.

13.    Defendant MAC Customs is a private corporation headquartered and incorporated in California. Former Unipac Continental broker Irene Mac founded MAC Customs in August of

2018 and is the owner of MAC Customs. MAC Customs contracts with IVC to classify IVC's merchandise when IVC imports vitamins and nutritional supplements from China.[2] MAC Customs employees certify to the United States Government on CBP Form 7501 that they have truthfully and correctly classified IVC's imported merchandise. But MAC Customs, on behalf of IVC, intentionally misclassified and continues to misclassify merchandise, causing IVC to pay lower duty rates for imported merchandise.

14.     Upon information and belief, IVC Vice President of Global Logistics and Distribution Neil Costigan was instrumental in helping former Unipac Continental employee Mac incorporate MAC Customs. Upon information and belief, MAC Customs began contracting with IVC in or around July 2019.

### III. REGULATORY STRUCTURE

A. *Importer Requirements.*

15.     All merchandise imported into the United States must be "entered" unless specifically exempted. 19 C.F.R. § 141.4(a); 19 U.S.C. § 1484. "Entry" means, among other things, that an importer or its agent must file appropriate documents with an officer of CBP that allows CBP to evaluate the customs duties due on the merchandise being imported into the United States. 19 C.F.R. § 141.0a(a).

16.     The documents required to be filed with CBP in order to complete entry include, among other things: (1) a bill of lading or air waybill, (2) a commercial invoice, and (3) an entry

---

[2] Mac was first employed by Unipac Continental and then founded MAC Customs over the time period discussed in this Complaint. Although MAC Customs was incorporated in August of 2018, Ms. Mac continued to work at Unipac Continental until approximately July 2019, at which point she began doing business under MAC Customs. Sam Tsui, a former entry-writer of Unipac Continental, also joined MAC Customs in or around July 2019.

summary (CBP Form 7501). *See, e.g.,* 19 C.F.R. §§ 141.11, 141.19(a), 141.81, 141.86(a), 142.3(a), 142.6(a).

17.     Duty is owed each time dutiable merchandise enters the United States. 19 C.F.R. § 141.2.

18.     Generally, the importer is required to deposit estimated duties with CBP at the time of entry. 19 U.S.C. § 1505; 19 C.F.R. § 141.101. The amount of customs duty owed is equal to the value of the imported merchandise multiplied by the applicable duty rate set forth in the HTS of the United States. *See generally* 19 C.F.R. §§ 152.11, 152.12.

19.     Information about the applicable duty must be reported to the United States on CBP Form 7501. Specifically, CBP Form 7501 requires the importer to declare the value or approximate value of the imported merchandise, which must also be reflected on the commercial invoice. Federal law provides that every importer must file a declaration stating that this information set forth in any entry documents is accurate. 19 U.S.C. § 1485.

20.     Central to this case, CBP Form 7501 further requires that the person entering the merchandise classify the merchandise according to the HTS and include the HTS Code and the applicable tariff rate of the goods imported. *See* CBP Form 7501. CBP Form 7501 also specifically requires a declaration from the person entering the merchandise that "the statements in the documents herein filed fully disclose to the best of my knowledge and belief the true prices, values, quantities . . . and are true and correct . . . I will immediately furnish to the appropriate CBP officer any information showing a different statement of facts." *See* CBP Form 7501.

21.     Based on the values submitted on Form 7501, the importer must pay applicable duty and must also pay any additional tariffs that are imposed on the merchandise. For example, HTS Code 2106.90.9898, reserved for miscellaneous edibles that are not specifically identified

elsewhere in the HTS (e.g., many vitamins and nutritional supplements), invokes a duty rate of 6.4% and an additional 15% tariff, effective September 1, 2019, if the merchandise is imported from China. *See* Harmonized Tariff Schedule, HTSUS 2106.90.9898 (2019), https://hts.usitc.gov/current [hereinafter "HTSUS"]; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, LIST 4A – EFFECTIVE SEPTEMBER 1, 2019 (2019) [hereinafter "List 4A"].

B. *Classification of Merchandise Under the Harmonized Tariff Schedule.*

22.    Responsibility for classifying the merchandise by assigning proper HTS codes falls to the importer of the merchandise. *See* 19 U.S.C. § 1484. Merchandise classification is "governed by the principles set forth in the General Rules of Interpretation (GRIs) and, in the absence of special language or context which requires otherwise, by the Additional U.S. Rules of Interpretation. The GRIs and the Additional U.S. Rules of Interpretation are part of the [HTS] and are to be considered statutory provisions of law for all purposes." CBP, HQ H213697 (Nov. 20, 2012), https://rulings.cbp.gov/ruling/H213697.

23.    These rules provide that the importer must consider both the use and the composition of a substance to effectuate the classification. By following the GRI, an importer looks at the qualities of the merchandise and the descriptions of the HTS and finds the appropriate code to classify the merchandise. In instances where two or more tariff categories may colorably describe a substance, the HTS code corresponding to the substance's use governs over the code related to its composition.[3]

---

[3] Additional U.S. Rule of Interpretation 1(a) requires that "a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of goods of that class or kind to which the imported goods belong, and the controlling use is the principal use." HTSUS, Additional Rule 1(a), GN, p. 2. Courts have applied a seven-factor test to determine whether imported merchandise is of a "certain class or kind" to which the imported goods belong. CBP, HQ W968402 (Jan. 8, 2009),

C. *Supplemental Tariffs from the U.S.–China Trade War.*

24.    On July 6, 2018, CBP began collecting supplemental 25% tariffs on 818 categories of imported Chinese merchandise. *See* Dorcas Wong and Alexander Chipman Koty, *The U.S.– China Trade War: A Timeline*, CHINABRIEFING (last visited Aug. 16, 2019), https://www.china-briefing.com/news/the-us-china-trade-war-a-timeline/. These first 818 categories of imported Chinese merchandise were explicitly delineated on a list titled "List 1." Since List 1, the Executive Branch has published four more lists: List 2, List 3, List 4A and List 4B (collectively, the "Lists"). Lists 1, 2, and 3 impose supplemental 25% tariffs and are already in effect.[4] *See Id.* CBP began collecting 15% tariffs on products on List 4A on September 1, 2019 and will begin collecting tariffs on List 4B on December 15, 2019.

25.    Importantly, the List 4A tariffs implemented on September 1, 2019 impose additional tariffs on HTS Code 2106.90.9898, the correct code for Glucosamine Chondroitin. List 4A.

26.    Thus, not only does misclassifying a substance influence the associated duty rate of HTS, it can also result in the avoidance of the supplemental 15% to 25% tariffs applied to goods

---

https://rulings.cbp.gov/ruling/W968402. These seven factors include:

> (1) the general physical characteristics of the merchandise; (2) the expectation of the ultimate purchasers; (3) the channels, class or kind of trade in which the merchandise moves; (4) the environment of the sale (i.e., accompanying accessories and the manner in which the merchandise is advertised and displayed); (5) usage, if any, in the same manner as merchandise which defines the class; (6) the economic practicality of so using the import; and (7) the recognition in the trade of the use.

*Warner-Lambert Co. v. United States*, 28 C.I.T. 939 (2004), aff'd, 425 F.3d 1381 (Fed. Cir. 2005).

[4] CBP began collecting tariffs on List 2 and 3 products on August 23, 2018 and September 24, 2018, respectively.

from China. Companies that misclassify goods on one of the Lists are defrauding the Government of duties and defying the United States trade policy on China.

　　*D. The False Claims Act.*

　　27.　　The FCA, 31 U.S.C. § 3729(a)(1)(G), states that "any person who— knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410), plus 3 times the amount of damages which the Government sustains because of the act of that person."

　　28.　　The FCA imposes the same liability on anyone who conspires to commit such a violation. 31 U.S.C. § 3729(a)(1)(C).

　　29.　　The FCA permits suits by a private person based on such violations. 31 U.S.C. § 3730(b).

## III. <u>DEFENDANTS' FRAUDULENT SCHEME</u>

　　30.　　To defraud the United States of over $13 million in customs duties owed on nutritional products and vitamins, IVC, Unipac Continental, and MAC Customs intentionally misclassified merchandise that IVC was importing, including on CBP Form 7501. Defendants did so in order to avoid duties owed under the correct, higher HTS rates. While perpetrating this fraudulent scheme, Defendants sought to conceal their misclassifications and created documents evidencing such misclassifications were intentional.

31.     Relator discovered the fraud in June 2019. Specifically, he discovered that IVC, Unipac Continental, and MAC Customs had consistently and intentionally misclassified various merchandise, including Glucosamine Chondroitin, in order to pay lower duty rates. Relator gathered invoices that show IVC's misclassifications and false certifications of compliance on the CBP Form 7501. Further, Relator recovered the PwC report that detailed $13 million of fraud since 2013.

32.     Relator alerted his supervisors to these frauds. But these supervisors failed to respond and instead instructed Relator not to discuss the violations. Relator retained counsel and disclosed the fraud to the United States on July 19, 2019.

### A. *Example: IVC Intentionally Misclassified Glucosamine Chondroitin.*

33.     One of IVC's largest imports to the United States is Glucosamine Chondroitin. Through his employment with IVC, Relator ascertained that IVC was fraudulently failing to pay duties owed on Glucosamine Chondroitin imports. Typically, it did so by classifying Glucosamine Chondroitin under HTS Heading 3004 **as a medicament**. Imports properly classified under HTS Heading 3004 are not subject to import duties (i.e. they qualify for duty free treatment).[5] As set for below, however, Glucosamine Chondroitin should be classified exclusively under Chapter 21, because **it is a nutritional supplement**. Chapter 21 invokes a 6.4% duty rate. Through this

---

[5] IVC has also incorrectly classified Glucosamine Chondroitin under Chapter 29, which is reserved for separately identifiable and distinct chemical compounds. *See* HTSUS, Ch. 29. Because Glucosamine Chondroitin is created by affirmatively adding glucosamine to chondroitin, or vice versa, it cannot be classified under Chapter 29. *See* CBP, HQ 965397 (Mar. 5, 2012), https://rulings.cbp.gov/ruling/H213697 ("While the imported merchandise contains D-glucosamine HTS, a separately and chemically defined organic compound, in this product it has been prepared with other substances (i.e. fish collagen, potassium sulfate and glutamine), placed inside a gelatin capsule and bottled. Such a preparation is no longer defined as a single chemical compound and therefore cannot be classified in Chapter 29.").

systemic misclassification alone, Defendants avoided paying nearly $10 million in customs duties owed to the Government between 2013 and 2018.[6]

i. *HTS Heading 3004 is Reserved for Medicaments.*

34.      Heading 3004 is reserved for "medicaments . . . consisting of mixed/unmixed products for therapeutic or prophylactic uses, put up in measured doses . . . or in forms or packings for retail sale."[7] "Therapeutic" is defined as "of or pertaining to the treating or curing of disease; curative," and "Prophylactic" is defined as "defending or protecting from disease, as a drug." *See* CBP, HQ 962323, at 5 (Mar. 8, 2000), https://rulings.cbp.gov/ruling/962398. Therefore, to be considered a medicament, the product must either cure or prevent a disease.

ii. *Studies on Glucosamine Chondroitin Demonstrate That It Is Not a Medicament.*

35.      There is, however, no evidence that Glucosamine Chondroitin has any medical benefits. Indeed, Glucosamine Chondroitin has plainly failed to demonstrate efficacy as a therapeutic substance in a variety of studies:

     a. A large National Institutes of Health (NIH) study called the Glucosamine/chondroitin Arthritis Intervention Trial (GAIT) compared glucosamine hydrochloride, chondroitin, both supplements together, celecoxib (a

---

[6] As explained above, where two or more tariff categories accurately describe a substance, the HTS code corresponding to the substance's primary use governs—not the code related to its composition to the extent that those two codes may differ. Furthermore, the packaging of the supplement when it enters the United States (e.g. in pills or in bulk powder) does not influence the classification decision. *See, e.g.*, CBP, NY D84925 (Nov. 30, 1998) (ruling that the applicable subheading for a dietary supplement comprised of glucosamine and other proteins was 2106.90.9998, regardless whether it was in packed in "tablets, blister packed or bulk, or as bulk powder"). Effective January 1, 2017, HTS Code 2106.90.99 was redesignated as 2106.90.98. *See* Change Record–Basic Edition (2017), https://hts.usitc.gov. All statistical suffixes previously appended to HTS Code 2106.90.99 are now appended to 2106.90.98. Therefore, the use of HTS Code 2106.90.9998 in 2014 is synonymous with the use of HTS Code 2106.90.9898 at present.

[7] HTSUS, Ch. 30.

prescription drug used to manage osteoarthritis pain), and a placebo in patients with osteoarthritis of the knee. Those who received the supplements had no statistically significant improvement in knee pain or function compared to those who received the placebo.[8]

b. A meta-analysis of 20 trials related to the effects of chondroitin on pain in patients with osteoarthritis published in the *Annals of Internal Medicine* found that "large-scale, methodologically sound trials indicate that the symptomatic benefit of chondroitin is minimal or nonexistent." The authors concluded that the "[u]se of chondroitin in routine clinical practice should therefore be discouraged."[9]

c. Another meta-analysis of 10 large-scale randomized trials including 3,803 patients with knee or hip osteoarthritis showed no clinically relevant effect of chondroitin, glucosamine, or their combination on patients' perceived joint pain.[10]

d. A study published in 2016 assessing the efficacy and safety of combination therapy with chondroitin sulfate and glucosamine sulfate compared to placebo in patients with symptomatic knee osteoarthritis was actually stopped early, because patients taking the supplements reported *worse* symptoms than those patients taking the placebo. The authors concluded that the chondroitin sulfate/glucosamine sulfate combination was not superior to the placebo in the reduction of joint pain.[11]

---

[8] Barnhill, J.G., et. al., *Chondroitin product selection for the glucosamine/chondroitin arthritis intervention trial*, 46 J. AM. PHARM. ASSOC. 14 (2006).

[9] Reichenbach, S., et al., *Meta-analysis: Chondroitin for osteoarthritis of the knee or hip*, 146 ANN. INTERN. MED. 580 (2007).

[10] Wandel, S., et al., *Effects of glucosamine, chondroitin, or placebo in patients with osteoarthritis of hip or knee: Network meta-analysis*, 341 BMJ c4675 (2010).

[11] Jorge A. Roman-Blas, et. al., *Combined Treatment With Chondroitin Sulfate and Glucosamine*

36.    Not only do the studies conclude there is no benefit from Glucosamine Chondroitin, the American Academy of Orthopedic Surgeons recommends against glucosamine and chondroitin for treatment of knee osteoarthritis. AAOS, *Five Things Physicians and Patients Should Question*, at 1 (Sept. 11, 2013), http://www.choosingwisely.org/wp-content/uploads/2015/02/AAOS-Choosing-Wisely-List.pdf.

37.    Absent clear evidence of Glucosamine Chondroitin's effectiveness as a therapeutic or prophylactic agent, as explained above, the substance does not qualify for duty free treatment as a medicament.

  iii.    <u>CBP Rulings, Lack of Dosage Instructions, and IVC Disclaimers All Confirm that Glucosamine Chondroitin Is Not a Medicament.</u>

38.    Other factors also support this finding. *First*, CBP has already ruled that glucosamine and chondroitin do not have prophylactic or therapeutic use and has denied classification under Heading 3004. *See* CBP, HQ 962697 (Oct. 10, 2000), https://rulings.cbp.gov/ruling/964373; *see also* CBP, N962697 (Nov. 24, 2014), https://rulings.cbp.gov/ruling/N259412 (classifying a supplement that included both glucosamine and chondroitin under HTS Code 2106.90.9998).

39.    *Second*, there is no recommended timeframe after which a person is advised to stop consuming Glucosamine Chondroitin. Glucosamine Chondroitin can instead be taken indefinitely by someone suffering from osteoarthritis, indicating that the product does not attempt to prevent or permanently cure the disease. *See,* HQ 962323 (Feb. 3, 2000),

---

*Sulfate Shows No Superiority Over Placebo for Reduction of Joint Pain and Functional Impairment in Patients With Knee Osteoarthritis: A Six-Month Multicenter, Randomized, Double-Blind, Placebo-Controlled Clinical Trial*, 69 ARTHRITIS & RHEUMATOLOGY 77 (2016).

https://rulings.cbp.gov/ruling/962323 at 5 ("The implication is that these products can be taken indefinitely by the consumer. The product does not attempt to cure or prevent a particular disease or ailment.").[12]

40.    The U.S. Court of International Trade has drawn attention to the term "measured dose" and its relationship to an imported product's therapeutic or prophylactic value:

> In short, dosage cannot be separated from therapeutic or prophylactic properties. A measured dose is not merely a certain amount; it should contemplate an effect therefrom. Hence, the dose must be viewed as a way to link the properties of a substance with that effect. Here, the plaintiff must show that a specific quantity of vitamin C, e.g., 60 milligrams per day, can help prevent disease. It would make little sense to classify a product as a medicament merely because of a vitamin content without first finding that that particular content could or does precipitate the therapeutic or prophylactic properties contemplated by heading 3004. Indeed, the use provision guards against that.

*Warner-Lambert*, 341 F. Supp.2d at 1280. The lack of dosage requirements for Glucosamine Chondroitin thus renders classification under Heading 3004 code in appropriate.

41.    *Finally*, IVC itself has expressly disclaimed any medical benefits of Glucosamine Chondroitin. For example, IVC packaged, labeled, and sold Glucosamine Chondroitin to

---

[12] Supplements containing both glucosamine and chondroitin are often taken by those suffering from joint pain due to osteoarthritis, a prevalent chronic disease that occurs when the protective cartilage between bones wears down over time. Osteoarthritis, MAYOCLINIC (May 8, 2019), https://www.mayoclinic.org/diseases-conditions/osteoarthritis/symptoms-causes/syc-20351925. Clinically, this destruction of articular cartilage results in impaired joint motion, severe pain, and, ultimately, disability. Ameye LG and Chee WS, *Osteoarthritis and nutrition. From nutraceuticals to functional foods: a systematic review of the scientific evidence*. 8 ARTHRITIS RES. THER. 127 (2006). Pathologically, osteoarthritis is associated with a local deficiency in key natural substances, including glucosamine and chondroitin. Supplementing the body's natural production of these two substances is colloquially thought to aid in cartilage repair by stimulating the synthesis of the biological compounds that make up cartilage. Simanek V, et al., *The efficacy of glucosamine and chondroitin sulfate in the treatment of osteoarthritis: are these saccharides drugs or nutraceuticals?* 149 BIOMED PAP. MED. FAC. UNIV. PALACKY OLOMOUC. CZECH. REPUB. 51 (2005); Pavelká K, at al., *Glucosamine sulfate use and delay of progression of knee osteoarthritis: a 3-year, randomized, placebo-controlled, double-blind study*. 162 ARCH. INTERN MED. 2113 (2002). But, as set forth above, trials have not borne out this hypothesis.

Walgreens. The label of this Glucosamine Chondroitin states that Glucosamine Chondroitin "*may help support flexibility & healthy mobility*" (emphasis added) but disclaims that "[t]hese statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease." Thus, although IVC claims that Glucosamine Chondroitin is a medicament on CBP Form 7501, it tells the public that Glucosamine Chondroitin is a supplement with no tested medical benefits. This obvious contradiction shows that IVC knows that its statements on CBP Form 7501 are false.



*Figure 1: IVC created this Glucosamine Chondroitin label for Walgreens, which specifically disclaims that any claims of the supplement's efficacy are untested.*

42.    For these reasons, the actions by IVC, Unipac Continental, and MAC Customs to claim duty free status for Glucosamine Chondroitin under Heading 3004 are fraudulent.

    *iv.    Glucosamine Chondroitin Is Properly Classified as a Supplement.*

43.    Because Glucosamine Chondroitin cannot be coded under Heading 3004, it must be classified according to its use: a dietary supplement.[13] Dietary supplements that have no medical

_____

[13] More specifically, 21 U.S.C. § 321(ff) defines "dietary supplement" as a product, other than tobacco, "that contains one or more of certain dietary ingredients, such as a vitamin, a mineral, an herb or other botanical, an amino acid, a dietary substance for use by man to supplement the diet

benefit are typically classified under HTS chapter 21 and are thus subject to a 6.4% tariff.[14] That

is, the proper classification for Glucosamine Chondroitin is HTS Code 2106.90.9898, the provision

for "Food preparations not elsewhere specified or included: Other: Other: Other: Other: Other:

Other: Other: Other: Other:" HTSUS, Ch. 21.

        44.    By intentionally misclassifying Glucosamine Chondroitin under Heading 3004

instead of under HTS Code 2106.90.9898, IVC has violated and continues to violate the False

Claims Act by avoiding customs duties of 6.4%. IVC has thereby defrauded the Government of

millions of dollars over at least the last five years, the lookback period analyzed by PwC, as

explained below.

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | | | | International Vitamin Corp - MASTER HTS CODE and LOG | | | | |
| 2 | | | | | | | | |
| 3 | DESCRIPTION | PRODUCT ITEM # | LIST 3 - 10% 2ND HTS | SPI (K | LIST 4 | HTS | DUTY RA | UOM |
| 28 | • Chondroitin Glucosamine Tablet(518532) | 518532 | OK | | | 3004.90.9290 | FREE | KG |
| 29 | • Chondroitin Glucosamine Tablet(RSPO/MB)(518412) | 518412 | OK | | | 3004.90.9290 | FREE | KG |
| 30 | • Glucosamine 750mg/MSM 750 mg/HA 1.65mg Tablet(RSPO/MB)(518631) | 518631 | OK | | | 3004.90.9290 | FREE | KG |
| 31 | • Chondroitin Glucosmaine & MSM Tablet(518529) | 518529 | OK | | | 3004.90.9290 | FREE | KG |
| 32 | • Chondroitin Glucosmaine W/MSM TB(RSPO/MB)(518618) | 518618 | OK | | | 3004.90.9290 | FREE | KG |

*Figure 2: IVC incorrectly classifying Glucosamine Chondroitin as a medicament (HTS Code 3004.90.9290) instead of a food–other merchandise (HTS Code 2106.90.9898).*

by increasing the total dietary intake, or a concentrate, metabolite, constituent, extract, or combination of the preceding ingredients." *See,* HQ 962323 at 6. Section 321(ff) further defines the term to apply to "products intended for ingestion in a form described in 21 U.S.C. § 350(c)(1)(B)(I) (i.e., tablet, capsule, powder, softgel, gelcap, and liquid), that are not represented as conventional food, or as the sole item of a meal or of the diet, and that are labeled as dietary supplements." HQ 962323 at 6-7. Furthermore, "[e]xcept for purposes of paragraph (g) [of 21 U.S.C. § 321], a dietary supplement shall be deemed to be a food within the meaning of th[e] [act]." 21 U.S.C. § 321(ff).

[14] *See, e.g.,* CBP, NY D84925 (Nov. 30, 1998), https://rulings.cbp.gov/ruling/D84925; CBP, NY N243248 (July 5, 2013), https://rulings.cbp.gov/ruling/N243248; CBP, HQ 965397 (Mar. 5, 2002), https://rulings.cbp.gov/ruling/965397; CBP, N962697 (Nov. 24, 2014), https://rulings.cbp.gov/ruling/N259412.

v. *Unipac Continental and MAC Customs Employees Signed False CBP Forms 7501.*

45.     Unipac Continental and MAC Customs have assisted in this fraud. Unipac Continental and MAC Customs contracted with IVC to classify IVC's imported merchandise. Personnel acting on behalf of Unipac Continental and MAC Customs signed the CBP Forms 7501 for the importation of IVC's Glucosamine Chondroitin, including certifying that the HTS codes invoked were correct. These certifications were false and were material to avoiding obligations to remit customs duties to the Government.

46.     For example, on December 5, 2018, IVC imported Glucosamine Chondroitin tablets from China into the United States under HTS Code 3004.90.9290 and claimed duty free status. Sam Tsui, then an entry writer for Unipac Continental (now an employee of MAC Customs), signed the CBP Form 7501 and declared that all "statements in the document . . . are true and correct." *See* Ex. 1 (Inv - 3583859 (Dec)). As discussed above, however, Heading 3004 contains duty free codes reserved for merchandise that has a therapeutic or prophylactic use. Glucosamine Chondroitin, on the other hand, is a nutritional supplement and must be classified under HTS Code 2106.90.9898, invoking a duty rate of 6.4%. The total value of the merchandise entered on December 5, 2018 was $1,123,964, meaning that IVC defrauded the Government by approximately $72,000 on this one import alone.

47.     Likewise, on May 6, 2019, IVC again imported Glucosamine Chondroitin tablets from China into the United States under HTS Code 3004.90.9290, claiming duty-free status. Tsui again signed the CBP Form 7501 on behalf of Unipac Continental and declared that all "statements in the document . . . are true and correct." *See* Ex. 2 (Invoice - 3604659). Because Glucosamine Chondroitin must be classified under HTS Code 2106.90.9898, invoking a duty rate of 6.4%, and

because the total value of the merchandise entered was $837,476, IVC defrauded the Government of approximately $53,600 on this import.

48.      On July 24, 2019, IVC again imported Glucosamine Chondroitin tablets from China into the United States under HTS Code 3004.90.9290, claiming duty-free status. Tsui again signed the CBP Form 7501, this time on behalf of MAC Customs, and declared that all "statements in the document . . . are true and correct." *See* Ex. 3 (Invoice – B00001021). Because Glucosamine Chondroitin must be classified under HTS Code 2106.90.9898, invoking a duty rate of 6.4%, and because the total value of the Glucosamine Chondroitin entered was $305,296, IVC defrauded the Government of approximately $19,540 on this import.

49.      Also on July 24, 2019, IVC imported more Glucosamine Chondroitin tablets from China into the United States under HTS Code 3004.90.9290, claiming duty-free status. Tsui again signed the CBP Form 7501, again on behalf of MAC Customs, and declared that all "statements in the document . . . are true and correct." *See* Ex. 4 (Invoice – B00001023). Because Glucosamine Chondroitin must be classified under HTS Code 2106.90.9898, invoking a duty rate of 6.4%, and because the total value of the Glucosamine Chondroitin entered was $303,082, IVC defrauded the Government of approximately $19,400 on this import.

50.      IVC has taken actions to conceal its failure to pay customs duties owed on Glucosamine Chondroitin. For example, IVC renamed the supplement "Glucosamine with Chondroitin" and eventually "Chondroitin Glucosamine" on CBP Form 7501. IVC Director of Finance Kathy Stewart told Relator that the "rumor is, [IVC] changed the name to Chondroitin Glucosamine on the import sheet in order to get out of paying duties." Of course, a name change to a product does not alter the classification principles; it evidences an intent to deceive the CBP.

vi.   *Defendants Are Liable For Civil Penalties for Each False CBP Form 7501.*

51.    Over the last six years, Defendants' intentional misclassifications robbed the United States of millions of dollars in customs duties. In addition, each fraudulent misclassification is false statement material to a false claim, invoking the False Claims Act's civil penalty provisions, and thus making IVC liable for millions more.

52.    Relator created the following table from Purchase Order data. The table identifies the number of imports each year where IVC and Unipac Continental and/or MAC Customs intentionally misclassified merchandise:

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 (1/1/19–7/24/19) | Total |
|---|---|---|---|---|---|---|---|---|
| Glucosamine Chondroitin Products | 12 | 34 | 72 | 43 | 50 | 47 | 22 | **280** |
| Other Products on PwC's List | 10 | 47 | 168 | 165 | 177 | 173 | 77 | **817** |
| **Total** | **22** | **81** | **240** | **208** | **227** | **220** | **99** | **1097** |

Because IVC and Unipac Continental and/or MAC Customs misclassified merchandise on at least 1,097 occasions by making at least 1,097 false statements, Defendants are liable for over $12 million dollars in civil penalties, in addition to the millions of dollars it withheld in tariffs.

**B.  *Since 2013, International Vitamin Corporation Has Withheld Over $13 Million in Tariffs From the United States.***

i.   *PwC's Analysis Indicates that IVC Withheld Over $13 Million in Tariffs.*

53.    In 2018, IVC's Director of Tax Lisa Grace was tasked with analyzing the impact of new tariffs on Chinese products. She hired PwC to perform an independent US tariff classification review and duty rate analysis for 134 products over the previous five years. *See* Ex. 5 (PwC Invoice).

54.     Upon information and belief, President and CEO Dai knew that PwC analysis would uncover IVC's fraudulent activities. Accordingly, when CEO Dai learned of the project, he instructed Director Grace to stop all work and cease communications with the PwC consultants. But Director Grace did not obey CEO Dai's instruction. She instead continued her analysis in collaboration with PwC.

55.     PwC's report determined that IVC had misclassified and/or was continuing to misclassify 32 products in order to invoke lower duty rates and to avoid supplemental rates imposed on merchandise imported from China. In total, PwC's analysis found that IVC avoided obligations to pay more than $13 million in duties to the United States Government between 2013 and 2018. *See* Ex. 6 (IVC Tariff Coding Analysis spreadsheet). Of this $13 million, more than $9.5 million was attributed to IVC's chronic misclassification of Glucosamine Chondroitin and more than $3 million was attributable to other misclassifications.

56.     The PwC report convinced senior managers at IVC that the Company had committed fraud. But instead of informing the Government that IVC had avoided obligations to pay duties on imported merchandise and tendering the duties owed, IVC instead shifted its focus to covering up the fraud and avoiding the customs duties owed to the Government.

57.     For example, in speaking about the Glucosamine Chondroitin misclassification, IVC Vice President ("VP") of Finance Steve Vermillion told Relator that "we don't want to bring attention to that $10 million 'bad guy.'" In another conversation with Relator, VP Vermillion said that he had a "bad feeling" that IVC was "monkeying around with [the] codes," which would someday "catch up with IVC." Similarly, IVC Executive VP of Sales Dick Hill told Relator that "when you make an error on your taxes, you don't go back through old returns and pay what you owe."

ii.     *IVC Engages in a Concerted Effort to Delete Evidence of the PwC Analysis and to Avoid Paying Customs Duties Owed to the Government.*

58.     IVC also sought to delete all traces of the PwC analysis. After reviewing the PwC analysis, on May 27, 2019, IVC VP of Global Logistics and Distribution Neil Costigan circulated the fraudulent master list of HTS Codes created by Irene Mac. He directed IVC, Unipac Continental, and MAC Customs to use  this list going forward. He downplayed the PwC spreadsheet by characterizing it as "incorrect." *See* Ex. 7 (FW_MASTER LIST); Ex. 8 (IVC HTS MASTER spreadsheet). That is, VP Costigan essentially instructed IVC and its brokers to ignore PwC's corrections.

59.     Relator specifically spoke with VP Costigan on the issue of the two spreadsheets in person on June 12, 2019. Although VP Costigan is generally an amiable person, his disposition shifted noticeably when Relator raised the issue of the two spreadsheets. When Relator asked VP Costigan about the differences between the PwC spreadsheet and VP Costigan's, VP Costigan interrupted Relator and told him that the only valid list was the one created by Irene Mac that he had circulated, that the same information had been relayed to Director Grace when she was given the tariff assignment a year earlier, and that he had told Director Grace to use Irene Mac's spreadsheet exclusively. He also told Relator that any other list he had, including the PwC analysis, should be "thrown away."

60.     Also on June 12, 2019, Relator spoke with Nora Dowell, IVC's VP of Corporate Quality Management and Regulatory Affairs. VP Dowell informed Relator that Director Grace had retained PwC to analyze and monetize the Company's imports from China. VP Dowell relayed that PwC had discovered that IVC had been importing merchandise under incorrect HTS codes resulting in approximately $13 million in underpayment of customs duties to the United States.

61.     IVC, nonetheless, never took steps to repay the debts owed. Throughout August of 2019, IVC held series of meetings to decide how to classify imported merchandise going forward and how to formally address the PwC analysis. At no point was there a discussion to return the money it owed the United States Government.

62.     IVC instead sought to create pretext for its continuing fraud. For example, on August 1, 2019 Relator attended a meeting with VP Dowell, IVC Global Logistics Manager Jason Moon, and Mac and Tsui (then of MAC Customs). VP Dowell presented the analysis Director Grace had done in 2018 with PwC and asked Global Logistics Manager Moon to create a file that included hyperlinks to the various CBP rulings governing the assignment of HTS codes to the various imports. She also asked Global Logistics Manager Moon to remove all financial information from the spreadsheet, including the $13 million five-year lookback calculation. Relator understands that this document may have been prepared in anticipation of a CBP audit, so that IVC could claim that it was not aware of the proper HTS codes at the time that it misclassified merchandise, and that it subsequently changed course, based on CBP rulings, to bring itself into compliance. Such an explanation, however, would make little sense: Many of the CBP rulings that are included in the PwC spreadsheet predate 2013—before even the five-year lookback. Accordingly, IVC cannot credibly assert that "new" CBP rulings altered the appropriate classifications. Relator indeed understood that IVC intentionally removed all financial information from the spreadsheet, because it intended to continue avoiding its obligation to pay the back-owed amount calculated by PwC.

63.     Relator summarized the August 1 meeting to VP Vermillion on August 9. VP Vermillion responded that IVC would likely not correct codes, because doing so would cost IVC more than $13 million and because CEO Dai would not authorize it. VP Vermillion then called

VP Dowell with Relator in the room. During the call, VP Dowell explained that she had told IVC's customs brokers not to change the codes until directed by more senior IVC managers. VP Vermillion then commented that the $13 million liability was "a big problem" and that "if [IVC was] a public company . . . someone would be fired . . . . [It] would involve big fines and possible jailtime." VP Dowell concurred.

64.    The final meeting about the tariffs in which Relator participated took place on August 12. Mac and Tsui discussed with VP Dowell and Relator how MAC Customs would classify merchandise in the future. Mac stated that she was still using the historical codes (the fraudulent, non-PwC codes) under the direction of senior managers in China and VP Costigan, because the historical codes were boosting IVC's profits.[15] Throughout the meeting, Ms. Mac maintained that IVC could claim ignorance if CBP discovered that IVC had been using improper codes.

65.    Relator doubts that IVC will change its classification practices because senior managers at IVC, including CEO Dai and VP Costigan, have consistently stated their preference for use the historical codes.

       *iii.*    *IVC Seeks to Avoid Supplemental List 4 Tariffs, Thwarting U.S.-China Policy.*

66.    By ignoring the PwC analysis, IVC has sought to avoid not only its obligation to pay back customs duties owed according to the PwC report, but, also, additional duties forthwith, including the 15% tariffs on List 4 that became effective on September 1, 2019. As discussed above, the correct HTS code for Glucosamine Chondroitin is 2106.90.9898, not 3004.90.9290— the HTS code under which IVC, Unipac Continental, and MAC Customs have repeatedly classified

---

[15] Mac also mentioned that she had been told to use and had been using a special "K" code that designated the item as having a "Pharmaceutical Use" to be imported duty free. This special "K" code was not analyzed by PwC and may evidence additional fraud by IVC.

Glucosamine Chondroitin. As of September 1, 2019, HTS Code 2106.90.9898 invokes an additional 15% tariff rate applied to certain imports from China, but HTS Code 3004.90.9290 remains duty free. Thus, by continuing to misclassify Glucosamine Chondroitin IVC will now lower the claimed duty rate by up to 21.4%.

67.    While employed at IVC, Relator had estimated the yearly impact of the additional List 4 tariffs would be approximately $10.8 million per year if IVC coded correctly.[16] *See* Ex. 9 (Tariff Impact Bulks (List 4 beg 9-1-19).xlsx); Ex. 10 (2019-08-15 Tariff Impact Analysis). Defendants fraud thus stands to increase substantially if left unchecked.

68.    In sum, IVC has intentionally attempted to prevent an independent audit of its classification practices, and, once it was performed, IVC intentionally ignored its conclusions. Upon information and belief, IVC continues to fraudulently claim duty free treatment for millions of dollars in dutiable goods and has never sought to pay the custom duties it already owes to the United States.

## IV. CLAIMS FOR RELIEF

### COUNT I

### VIOLATIONS OF THE FALSE CLAIMS ACT—AVOIDING OBLIGATIONS TO PAY

### 31 U.S.C. § 3729(a)(1)(G)

69.    Relator Welin incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

---

[16] On August 23, 2019, President Trump and Office of the United States Trade Representative issued a statement that it would increase the tariffs on List 4A and 4B merchandise from 10% to 15%. USTR, *USTR Statement on Section 301 Tariff Action Regarding China*, USTR (Aug. 23, 2019), https://ustr.gov/about-us/policy-offices/press-office/press-releases/2019/august/ustr-statement-section-301-tariff. Relator performed the analysis prior to August 23 when the tariff was projected to be 10%. Thus, the yearly impact to the United States Government from IVC's fraud is likely more than $10.8 million per year.

70.     Relator, on behalf of himself and the United States, seeks relief against Defendants under Section 3729(a)(1)(G) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

71.     As set forth above, Defendants knowingly made, used, or caused to be made or used, false records and/or statements to conceal, avoid, or decrease obligations to pay or transmit money or property, in the form of customs duties, to the United States.

72.     As set forth above, Defendants knew of their obligation to pay or remit money or property, in the form of customs duties, to the United States and still failed to pay or transmit the owed custom duties.

73.     The Government incurred losses in the form of customs duties wrongfully underpaid or unpaid by Defendants because of their wrongful and fraudulent conduct. By virtue of the false records or statements made by Defendants, the Government suffered damages and is therefore entitled to treble damages under the False Claims Act, to be determined at trial, and a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410).

## COUNT II

## VIOLATIONS OF THE FALSE CLAIMS ACT—CONSPIRACY

### 31 U.S.C. § 3729(a)(1)(C)

74.     Relator Welin incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

75.     This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §§ 3729–32.

76.     As set forth above, Defendant IVC has conspired with Defendants Unipac Continental and MAC Customs to defraud the United States Government by fraudulently avoiding

obligations to remit money to the United States Government, in the form of customs duties, in violation of 31 U.S.C. § 3729(a)(1)(C).

77.     Defendants also conspired to conceal the actions set forth above.

78.     The Government incurred losses in the form of customs duties wrongfully underpaid or unpaid by Defendants because of their wrongful and fraudulent conduct. By virtue of the false records or statements made by Defendants, the Government suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, and a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff/Relator prays for judgment against Defendants as follows:

a.   That Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq*.

b.   That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729 *et seq.*, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410)*;*

c.   That Plaintiff/Relator be awarded the maximum amount allowed pursuant to Section 3729(d) of the False Claims Act;

d.   That Plaintiff/Relator be awarded all costs and expenses of this action, including attorney's fees;

e.   Such other and further relief as the Court deems just.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relator hereby demands a trial by jury.

Dated: October 16, 2019

Respectfully submitted:

_____
Russell L. Kornblith (RK-1950)
**SANFORD HEISLER SHARP, LLP**
1350 Avenue of the Americas, 31st Fl.
New York, New York 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
Email: rkornblith@sanfordheisler.com

John McKnight*
**SANFORD HEISLER SHARP, LLP**
111 Sutter Street, Suite 975
San Francisco, CA 94104
Telephone: (415) 795-2020
Facsimile: (415) 795-2021
Email: jmcknight@sanfordheisler.com
*_Pro hac vice_ forthcoming

Shaun Rosenthal*
**SANFORD HEISLER SHARP, LLP**
700 Pennsylvania Ave, SE
Washington, D.C. 20003
Telephone: (202) 499-5200
Facsimile: (202) 499-5199
Email: srosenthal@sanfordheisler.com
*_Pro hac vice_ forthcoming

_Attorneys for the Plaintiff-Relator Zachary Welin_